IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| BRUCE & SYLVIA FOREACRE,<br><br>Debtor. | Chapter 7<br>Case No. 05-7179-SSC<br><br>**MEMORANDUM DECISION** |

## I. INTRODUCTION

This matter comes before the Court pursuant to an "Objection to Property Claimed Exempt" ("Objection") filed by the Anthony Mason, the duly appointed Chapter 7 trustee ("Trustee") in the above-captioned case, on May 25, 2005. On June 14, 2005, the Debtors filed their "Debtors' Response to Trustee's Objection to Claim of Exemption" ("Response"). After various pre-trial matters were considered, the Court ultimately conducted an evidentiary hearing. At the conclusion of the hearing, the matter was deemed under advisement.

In this Memorandum Decision, the Court has set forth its findings of fact and conclusions of law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure. The issues addressed herein constitute a core proceeding over which this Court has jurisdiction. 28 U.S.C. §§ 1334(b) and 157(b) (West 2006).[1]

---

**1.** The Bankruptcy Reform Act of 1978, as amended, applies to the issues in this proceeding, except for those changes made pursuant to the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.

1

## II. FACTUAL BACKGROUND

The Debtors filed their Chapter 7 bankruptcy petition on April 25, 2005 ("Filing Date").[2] Anthony H. Mason was appointed the trustee of the bankruptcy estate. The Debtors sold their residence located at 8748 W. Williams Road, Peoria, Arizona 85283 ("Williams Property") on or about April 12, 2005, and received net sale proceeds in the amount of $150,975.54 ("Residence Proceeds").[3] On their bankruptcy schedules, the Debtors claimed an exemption in the Residence Proceeds pursuant to A.R.S. § 33-1101(A).[4] The Debtors' daughter and son-in-law, Cynthia and Gerald Gill ("the Gills") had resided at the Williams Property with the Debtors prior to its sale, but the Gills did not have any interest in the Property.

On April 13, 2005, the Debtors deposited $149,475.54 of the Residence Proceeds into the Wells Fargo Checking Account No. xxxxxx4325 ("Checking Account").[5] On April 14, 2005, the Debtors transferred $139,475.54 from the Checking Account to the Wells Fargo Savings Account No. xxxxxx6263 (Savings Account"), leaving a balance of $10,000 in the Checking Account. On April 20, 2005, the Debtors then transferred $139,526.67 from the Savings Account back into the Checking Account. Separate and apart from the transfer of funds between the Checking and the Savings Account, the Debtors spent the sum of $9,500.68 on personal living expenses between April 13, 2005 through April 24, 2005.

As of the Filing Date, the balance of the Residence Proceeds in Debtors' Checking Account was $140,225.99.[6] On the Filing Date, the Debtors engaged in various

---

**2.** This is the Debtors' second bankruptcy. Their first case, 04-17512-JMM, was filed on October 5, 2004, and dismissed at the request of the Chapter 13 Trustee, Russell A. Brown, on March 2, 2005 due to the Debtors failure to file certain Arizona tax returns.

**3.** See Exhibit 6.

**4.** See Exhibit 1.

**5.** See Exhibit 5, Page 3.

**6.** See Exhibit 5, Page 4.

2

transactions: $1,500 was deposited into the Checking Account; $1,804 in cash was withdrawn from the Checking Account; and a check in the amount of $1,000 was withdrawn by the Debtors from the Checking Account to open an escrow at First American Title for the earnest money deposit to purchase the real property located at 17976 Goodson Rd, Caldwell, ID 83607 ("Idaho Property"). The Debtors testified that they and the Gills had viewed the Idaho Property prior to the Debtors' petition being filed. However, prior to the filing of the petition, the Gills placed an offer on the Idaho Property, and ultimately purchased the Idaho Property post petition.[7] According to the Debtors, the title to the Idaho Property was not placed in the their names, because they were unable to secure financing while in a Chapter 7 bankruptcy proceeding. Even after the filing of the bankruptcy petition, the Debtors continued to spend funds from the Checking Account. From April 26, 2005 through May 26, 2005, the Debtors spent the sum of $6,729.70.

On May 25, 2006, the Trustee filed an objection to the exemption claimed in the Residence Proceeds on the grounds that the Debtors had failed to provide the Trustee with the information and documentation that properly identified the Residence Proceeds as constituting the identifiable proceeds from the sale of the homestead property, and that the Residence Proceeds had been commingled with the other funds in the Debtors' Checking Account.[8] Although the Objection had been filed, on or about May 27, 2005, the Debtors paid the amount of $89,755.94, from the Checking Account,[9] to First American Title for the down payment on the Idaho Property, even though the contract, the title, and the financing for the Idaho Property were solely in the name of the Gills.[10] Effectively, as a result of these various documents, the Debtors

---

**7.** See Exhibit 10.

**8.** See Docket Entry No. 10.

**9.** Check No. 1035.

**10.** See Exhibit 9.

3

had transferred the Residence Proceeds, constituting the down payment on the Idaho Property, to the Gills. The Debtors continued to deposit and withdraw funds from the Checking Account, and the Debtors used the Residence Proceeds to purchase items and make other expenditures unrelated to the purchase of a new residence, including automobile loan payments, bill payments, other living expenses (such as dining out at restaurants), certain payments to relatives, and traveling to and from Idaho. The Debtors also continued to place their wages and social security payments into the Checking Account with the Residence Proceeds. The Debtors also used the Residence Proceeds to make improvements to the Idaho Property.

The Debtors' 341 Meeting of Creditors was held on June 9, 2005. The Debtors testified that they stayed at a hotel in Phoenix to attend the Meeting of Creditors. Although the Trustee testified that he was aware that the Debtors no longer resided in Arizona as of June 2005, he believed that they were simply renting a place to stay in another State. What is clear, and the Court so finds, is that the Debtors did not disclose to the Trustee, at the time of the 341 Meeting of Creditors, that they had effectively transferred a substantial portion of the Residence Proceeds to the Gills, so that the latter parties could purchase the Idaho Property in which the Debtors had no cognizable interest.

Once the parties proceeded with the initial disclosures necessary in this contested matter, the Trustee was advised that the Debtors had purchased residential property in Idaho.[11] When the Trustee commenced a search of the Idaho County records, after the Debtors' disclosure, he discovered that the Idaho Property was titled in the names of the Gills. The Debtors and the Gills currently reside at the Idaho Property. The Debtors make the mortgage payments, although the Gills contribute to the payment of the living expenses.

Although the Trustee focuses on a number of computations in determining what would be the appropriate relief if this Court were to rule in favor of the Trustee on one of his alternative theories, the Court finds that the critical computation for purposes of this decision is

---

**11.** See Exhibit 2.

4

that on the filing date, the Debtors had the sum of $140,225.99 in the Checking Account which constituted the Residence Proceeds.[12]

### III. LEGAL ANALYSIS

A. Overview.

The Trustee poses a number of theories to permit recovery of all or a portion of the Residence Proceeds for the estate. Given the Debtors' concealment of the purchase of the Idaho Property, the commingling of funds, and the use of the Residence Proceeds for daily living expenses, the Trustee requests denial of any homestead exemption to the Debtors and the recovery of the $150,975.54 for the estate.[13] Alternatively, the Trustee seeks recovery of the sum of $60,219.60, the amount remaining in the Checking Account, if the Debtors are entitled to claim the Residence Proceeds used to purchase the Idaho Property as exempt, or the sum of $40,787.74, the balance in the Checking Account, if the Debtors are entitled to the Residence Proceeds used for the Idaho Property as an exemption, and the post-petition expenditures of the Debtors are approved.

The filing of a bankruptcy petition creates an estate that consists of all of debtor's legal and equitable interests in property, including potentially exempt property. 11 U.S.C. § 541; Cusano v. Klein, 264 F.3d 936 (9th Cir. 2001); In re Trujillo, 215 B.R. 200 (9th Cir. BAP 1997); In re Smith, 342 B.R. 801 (9th Cir. BAP 2006); Chappel v. Proctor, 189 B.R. 489 (9th Cir. BAP 1995). Whether an asset is property of the estate is determined by examining the nature of the

---

**12.** For instance, the Trustee notes that after the Debtors made the down payment of $89,755.94 for the Idaho Property, the sum of $40,787.74 may have constituted the remaining funds in the Checking Account that were Residence Proceeds. However, since the Debtors commingled the funds in the Account, both pre-and post-petition, the Court is unable to come to such a factual conclusion.

**13.** As discussed more fully hereinafter, the Ninth Circuit case law would only permit recovery of those funds on hand at the time of the filing of the bankruptcy petition. In this case, the Debtors held the sum of $140,225.99 in the Checking Account which constituted Residence Proceeds.

5

asset on the date the bankruptcy petition was filed. In re Schmitt, 215 B.R. 417 (9th Cir.BAP 1997). Although the question of whether an interest claimed by the debtor is "property of the estate" is a question to be decided by federal law, the bankruptcy courts must review and analzye state law to determine whether, and to what extent, the debtor has any legal or equitable interests in property as of the commencement of the case. Butner v. United States, 440 U.S. 48, 54-55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979); In re Cohen, 300 F.3d 1097 (9th Cir. 2002); In re Pettit, 217 F.3d 1072 (9th Cir. 2000).

Section 522(b) of the Bankruptcy Code allows a debtor to exempt property from the bankruptcy estate. In re Lekas, 299 B.R. 597 (Bankr.D.Ariz. 2003). Arizona has "opted out" of the federal Bankruptcy Code's exemptions; therefore, Arizona law governs homestead exemptions. 11 U.S.C. §522(b); A.R.S. §33-1133(B)(West 2006); In re Smith, 342 B.R. 801 (9th Cir. BAP 2006). Pursuant to A.R.S. § 33-1101(A), a debtor may claim a homestead exemption in an amount not exceeding $150,000. The homestead exemption attaches to a person's interest in the identifiable cash proceeds from the sale of the homestead for eighteen (18) months after the sale or until a new homestead is established from the proceeds pursuant to A.R.S. § 33-1101(C).[14]

---

**14.** A.R.S. § 33-1101 (West 2006) provides:

A. Any person the age of eighteen or over, married or single, who resides within the state may hold as a homestead exempt from attachment, execution and forced sale, not exceeding one hundred fifty thousand dollars in value, any one of the following:

    1. The person's interest in real property in one compact body upon which exists a dwelling house in which the person resides.

    2. The person's interest in one condominium or cooperative in which the person resides.

    3. A mobile home in which the person resides.

    4. A mobile home in which the person resides plus the land upon which that mobile home is located.

B. Only one homestead exemption may be held by a married couple or a single person under this section. The value as specified in this section refers to the equity of a single person or married couple. If a married couple lived together in a dwelling house, a

6

The Arizona homestead is a statutory creation. If the language is plain, the courts must follow it. In re Plant, 300 B.R. 22 (Bankr.D. Ariz. 2003) *citing* Wuicich v. Solomon-Wickersham Co. 18 Ariz 164, 157 P. 972 (1916).

B. Identifiable Cash Proceeds.

One of the issues in this matter is whether the Debtors maintained an interest in identifiable cash proceeds after the sale of the Williams Property, as required by Arizona law. A.R.S. § 33-1101(C) (West 2006). The evidence reflects that the Residence Proceeds were extensively transferred back and forth between the Debtors' Checking and Savings Accounts. For example, on April 13, 2005, the Debtors deposited the sum of $149,475.54 of the Residence Proceeds into the Checking Account. The next day, the Debtors transferred the sum of $139,475.54 from the Checking Account to the Savings Account, leaving a balance of $10,000 in the Checking Account. A week later, the Debtors transferred the sum of $139,526.67 from the Savings Account back into the Checking Account. Numerous transactions occurred on the filing date of the Debtors' petition: $1,500 was deposited into the Checking Account; $1,804 in cash was withdrawn from the Checking Account; and a check in the amount of $1,000 was paid from the Checking Account for an earnest money deposit for the purchase of the Idaho Property.

---

condominium or cooperative, a mobile home or a mobile home plus land on which the mobile home is located and are then divorced, the total exemption allowed for that residence to either or both persons shall not exceed one hundred fifty thousand dollars in value.

C. The homestead exemption, not exceeding the value provided for in subsection A, automatically attaches to the person's interest in identifiable cash proceeds from the voluntary or involuntary sale of the property. The homestead exemption in identifiable cash proceeds continues for eighteen months after the date of the sale of the property or until the person establishes a new homestead with the proceeds, whichever period is shorter. Only one homestead exemption at a time may be held by a person under this section.

7

1  The Debtors also testified that they deposited their wages and Social Security checks into the
2  Checking Account, thereby commingling the funds with the Residence Proceeds. The Debtors
3  made numerous post-petition purchases or utilized the Residence Proceeds to pay living
4  expenses.

While Arizona has yet to address the issue directly, other Courts have held that homestead proceeds must be kept in a separate account and not commingled. *See* In re Polimino, 345 B.R. 708 (10th Cir.BAP 2006); In re Englander, 95 F.3d 1028(11th Cir. 1996); In re Kalynych, 284 B.R. 149 (Bank. M.D. Fla. 2002). The rationale is clear. Once the homestead proceeds are placed in the same account with other funds, such as wages, then those funds are no longer "identifiable." Therefore, based upon the evidence presented, the Court concludes that the Residence Proceeds are not identifiable cash proceeds from the sale of a homestead and are not exempt pursuant to A.R.S. § 33-1101(C). Ninth Circuit law requires that if the exemption is set aside, a debtor must turn over the funds that he or she is holding as of the date that the bankruptcy petition is filed. In re Golden, 789 F.2d 698 (9th Cir. 1986). In this case, the Debtors held the sum of $140,225.99 in non-exempt proceeds in their Checking Account on the filing date. Under the foregoing analysis, they must turn those funds over to the Trustee.

### C. The Failure to Reinvest the Proceeds

The Trustee also argues that the funds from the sale of the Williams Property residence were not used to purchase a new homestead for the Debtors, but were transferred to the Gills to purchase the Idaho Property. Thus, the Debtors failed to reinvest the Residence Proceeds in another homestead and, hence, have failed to comply with Arizona law to maintain the exempt status of the Residence Proceeds.

The homestead laws should be interpreted liberally to advance the objectives of the statute, the fundamental purpose of which is to protect the family against the forced sale of the home property from certain creditors. Matcha v. Winn, 131 Ariz. 115, 638 P.2d 1361

8

(Ariz.App. 1981). However, the right to claim a homestead exemption under Arizona law is not unlimited, and equitable considerations are important. In re Glaze, 169 B.R. 956 (Bankr. D. Ariz. 1994). The homestead exemption laws were not created merely for the purpose of conferring a privilege on a debtor, but to shelter the family and thereby benefit the state. Ferguson v. Roberts, 170 P.2d 855 (Ariz.1946).

In the decision of In re Golden, 789 F.2d 698 (9th Cir. 1986), the Ninth Circuit analyzed the limitations of a debtor's claim of an exemption in the proceeds received from the sale of the debtor's real property held as his homestead. In the Golden case, the debtor sold his residence and filed his Chapter 7 bankruptcy petition less than two months later. The debtor still retained the sum of $25,000 from the sale of his residence at the time of the petition filing. Id. at 699. Under California law, the debtor had a period of six months from the sale of his homestead property to "select" another homestead with the proceeds. Id. [15] Although the debtor asserted a claim of exemption in the remaining proceeds on his bankruptcy schedules, the Chapter 7 trustee chose not to oppose the claim of exemption. Unfortunately, although the debtor had full use of the proceeds, he did not timely reinvest the proceeds in a residence within the six months provided under California law. Once the six-month period under California law had expired, the trustee filed a pleading, requesting a turnover of the proceeds. Id. The Ninth Circuit noted that when the debtor elected to claim an exemption under applicable state law, the debtor was bound by the state law in effect on the date that the bankruptcy petition was filed. Id. at 700. Relying on the applicable California statute, and the case law interpreting it, the Court determined that to permit a debtor to retain the proceeds, with no time limitation, would be a detriment to the debtor's creditors without any benefit to the debtor's family. Yet, the California homestead statute was designed to protect the debtor's family. The Ninth Circuit stated, "California law requires reinvestment in order to prevent the debtor from squandering the proceeds for non-exempt purposes. . . .Applying California law, we therefore hold that when the

---

**15.** Cal.Civ.Code §1265 is set forth in the Golden Decision at 699.

9

debtor fails to reinvest homestead proceeds within a period of six months in which the debtor has control of those proceeds, the proceeds revert to the trustee." Id.

As to the debtor's argument, in Golden, that the trustee should somehow be estopped from asserting a turnover claim for the sale proceeds, since the trustee did not assert such a claim until after the time period under California law had passed, the Ninth Circuit stated that the trustee had acted properly. Because the estate's claim to the proceeds did not arise until after the six months had passed, the trustee had no choice but to wait. Id. at 701.

Finally, the debtor requested that the amount of the judgment be reduced, since he had spent a portion of the $25,000 after the bankruptcy petition was filed. The Ninth Circuit concluded that the purpose of the California exemption statute was to prohibit the squandering of funds by a debtor, which was exactly what happened. The Ninth Circuit concluded that the lower court did not err in requiring the debtor to turn over the funds that he had on hand on the date that he filed his bankruptcy petition. Id. at 701.

In the recent decision of In re Smith, 342 B.R. 801 (9th Cir. BAP 2006), the Bankruptcy Appellate Panel interpreted the same section of Arizona law as this Court and held that the homestead "statute simply cannot be read to create a permanent exemption in the sale proceeds, absent reinvestment in another homestead." Id. at 806. Specifically, if "the applicable state law requires certain conditions to be met as of the petition date, such as reinvestment, these conditions must be met in order to maintain exempt status." Id.

In Smith, the debtors sold their residence pre-petition, and deposited the net proceeds into a bank account. The debtors filed a chapter 7 petition after the sale of their residence, and claimed an exemption in the proceeds that remained in the account. The trustee objected to the exemption on the grounds that the debtors had failed to provide sufficient documentation to support their claim for exemption. Id. at 803. The debtors filed a response, but the trustee did not withdraw the objection or request a hearing. Approximately two years later, the trustee filed a motion to compel turnover of the sale proceeds as nonexempt property of the

10

1 estate, on the basis that the debtors had failed to reinvest the proceeds in another homestead
2 within eighteen months of the sale. The bankruptcy court denied the trustee's motion to compel
3 the turnover of the proceeds, because the trustee had failed to object, in a timely manner, to the
4 exempt status of the proceeds.

5    The Panel reversed the bankruptcy court's ruling, holding that the debtors' failure
6 to use the proceeds for the purchase of a new homestead, within the requisite eighteen-month
7 period, resulted in the exemption lapsing automatically by operation of law. Id. at 806.
8 Moreover, the Panel held that the bankruptcy estate had a "contingent, reversionary interest in
9 the sale proceeds." Id. at 808. Thus, the failure by the debtors to take certain action to maintain
10 the property's exempt status, resulted in the exempt property being transformed into nonexempt
11 property. Id.

12    The Bankruptcy Appellate Panel just addressed the same Arizona statutory
13 exemption in the decision of In re Konnoff, 2006 WL 3445575 (9th Cir. BAP 2006), which was
14 decided on November 14, 2006, after this matter was taken under advisement by this Court.
15 Although the Panel carefully reviewed the reasoned decision of the lower court, it reversed the
16 lower court and concluded that it was bound by the Ninth Circuit precedent in Golden and by the
17 Smith decision, which was determined by a Panel of the Bankruptcy Appellate Panel of the
18 Ninth Circuit considering almost the same exemption dispute under Arizona law. Id. at 2-3.[16]

19    As to the lower court's argument, in Konnoff, that the Supreme Court decision of
20 Owen v. Owen, 500 U.S. 305 (1991) had effectively overruled Golden, the Panel disagreed. In
21 Owen, the creditor had obtained and recorded a judgment against the debtor when he owned no
22 real property. The debtor then purchased a condominium which was not then exempt property

---

**16.** The Concurring Opinion of J. Pappas acknowledged that the Ninth Circuit precedent and one of the Panel's prior decisions required the ruling as set forth in Konnoff. However, because of the unfortunate results that might occur to those debtors that utilized homestead proceeds to pay nondischargeable debts or to pay post-petition medical expenses that might be incurred by a debtor, he requested that the Ninth Circuit and Panel decisions be reconsidered. Id. at 6-7.

11

under Florida law. The creditor's judgment lien attached to the condominium. Florida law was subsequently amended to allow a party to claim a condominium as exempt property; however, the statute did not vitiate pre-existing judgment liens that had attached to a condominium. The Supreme Court determined that the debtor had acquired a federal right to avoid a lien pursuant to the provisions of 11 U.S.C. §522(f) that could not be abrogated by the "built-in limitations" under applicable state law. Konnoff at 4, citing Owen, 500 U.S. at 308. The Panel determined that a state could provide no exemptions at all, or it could provide exemptions more generous than those provided under federal law. However, "if the exemptions directly conflict with the Code, then the Code prevails." Konnoff at 4, relying on Owen, 500 U.S. at 309-13.

Addressing the issues then remaining, the Panel concluded that the Arizona limitation of eighteen months in which to reinvest the homestead proceeds was not in conflict with any federal right afforded a debtor under the Bankruptcy Code. The Panel relied on the Ninth Circuit analysis in Golden, noting that those conditions or limitations imposed by applicable state law must be respected. Id. at 3. The Panel concluded that the Arizona homestead exemption did "not conflict with a specific provision of the Code, nor [did] it abridge or abrogate the right of the debtors to claim an exemption. Rather, it [required] the debtors to act affirmatively to maintain the exemption as claimed pursuant to the state law applicable as of the petition date." Id., relying on Smith, 342 B.R. at 806-07. Thus, the lower court's decision that the proceeds, which were exempt as of the petition date, remained exempt, notwithstanding the time limitation imposed by Arizona law, was reversed by the Panel.

In turning to the facts of this case, the Debtors failed to reinvest the Residence Proceeds in a manner consistent with Arizona law. The Debtors transferred the Residence Proceeds to the Gills and allowed the Gills to purchase the Idaho Property. The Debtors also used the Residence Proceeds for various living expenses, including dining out at various restaurants, moving expenses, and traveling back and forth between Arizona and Idaho. Additionally, the Debtors testified that the Residence Proceeds were used to make improvements

12

to the Idaho Property. The purpose of the exemption as to homestead proceeds is "not to protect the proceeds, in and of themselves, but rather, solely to allow the claimant to invest the proceeds in another homestead." In re Jones, 327 B.R. at 297 (Bankr. S.D. Texas 2005) *citing* In re Zibman, 268 F.3d 298 (5th Cir. 2001). Thus, in transferring the Residence Proceeds to the Gills, the Debtors essentially relinquished their interest in the Residence Proceeds, and changed the nature of the property from exempt to nonexempt.

This Court must also consider to what extent various Bankruptcy Appellate Panel decisions which conclude that a debtor's post-petition conduct should not alter the exempt status of the property, as of the petition date, affect the decision of this Court. *See* In re Kim, 57 B.R. 680 (9th Cir. BAP 2000); In re Herman, 120 B.R. 127 (9th Cir. BAP 1990).[17] The Panel in Smith recognized that Kim set forth the general rule that exemption rights are determined as of the petition date, but still relied on the Golden decision as controlling Ninth Circuit authority, and noted that "while exemptions are *generally* determined as of the petition date...where an applicable state law required compliance with a pre-condition to maintain exempt status, the Ninth Circuit has held otherwise."Smith at 806. This Court will follow the holding in Smith.

Pursuant to A.R.S. § 33-1101, the homestead exemption attaches to a person's

---

**17.** The In re Kim decision focused on the debtor's post-petition use of his retirement funds for living expenses. Although the debtor retired after he filed his petition, he was re-hired, but used his retirement funds to supplement his income. The Kim Panel concluded that the debtor's post-petition conduct did not vitiate his claim of exemption; however, the applicable state law did not limit or place any conditions upon the debtor once he had retired. 237 B.R. at 686-87. The Panel also noted that because the funds were held in a retirement plan with the anti-alienation provisions, and other appropriate safeguards necessary for a spendthrift trust, the retirement plan was not property of the estate, even though the debtor retired and transferred the funds into an Individual Retirement Account post petition. Id. at 688-89. In the Herman decision, the Panel distinguished its decision from that of Golden by stating that the Ninth Circuit precedent focused on the exemption that could be claimed in proceeds as of the petition date, and any limitations or qualifications thereto imposed by state law, whereas the Panel was considering only the debtor's interest in the residence upon which the state placed no such qualifications or limitations. 120 B.R. at 130, n.5. This Court is not considering a retirement account nor a residence exemption. Therefore, it must decide this matter consistent with the Ninth Circuit precedent.

13

interest in the identifiable cash proceeds from the sale of the homestead for a period of eighteen months after the sale, or until a new homestead is established from the proceeds. In this case, the Debtors commingled the Residence Proceeds, deposited wages and Social Security into the same Account, withdrew funds for living expenses, including dining at restaurants, and otherwise utilized the Residence Proceeds that ultimately resulted in the commingling of the Proceeds so that they were no longer identifiable. On this ground alone, as noted above, the Debtors have failed to comply with Arizona law and have lost their exemption. Moreover, the Debtors transferred a substantial portion of the Residence Proceeds to the Gills to allow the latter parties to purchase the Idaho Property, instead of reinvesting the Proceeds in their own homestead. Although the Debtors failed to provide the Trustee with the information concerning the purchase of the Idaho Property until substantially after the fact, even after the Trustee placed the Debtors on notice of his concerns, it is ultimately the Debtors' transfer of the Residence Proceeds to the Gills that destroyed the Debtors' claim of exemption in the Proceeds.

The Debtors had no interest in the Idaho Property when the hearing started in this matter.[18] The Debtors also used a portion of the Residence Proceeds to pay living expenses, including the dining-out at restaurants. Although the Debtors attempted to blur the distinctions between themselves and the Gills, as if they were all one, the Court concludes that the Debtors' lack of candor and manipulation concerning the transfer of the Residence Proceeds should be to the detriment of the Debtors. Ultimately the Debtors chose to transfer the Proceeds to the Gills to allow the latter parties to purchase the Idaho Property. The Debtors should be held to that decision. It is only when the Trustee pursued the Debtors, learned that their daughter and son-in-law had purchased the Idaho Property, and proceeded to trial in this matter, that the Debtors

---

**18.** The Court and the Trustee learned during the course of the trial that the Gills had allegedly transferred the Idaho Property back to the Debtors. However, given the delay in the disclosure and the transfer of the property from the Gills to the Debtors and the lack of evidence to support any such allegation by the Debtors, the Court will adhere to its finding that the Debtors transferred the Residence Proceeds to the Gills to purchase the Idaho Property.

14

finally allegedly attempted to undue their improper transfer to the Gills. It appears that the Debtors engaged in the very conduct that the Arizona statute was trying to prevent. They transferred the Resident Proceeds in an attempt to remove the Proceeds from their creditors.

### IV. CONCLUSION

Based upon the foregoing, the Court concludes that the Trustees's Objection is sustained, and the Debtors' claim of exemption in the proceeds is denied.

DATED this 29th day of December, 2006.

_____
Honorable Sarah Sharer Curley
United States Bankruptcy Judge

BNC to notice.